## SHAINWALD, Assignee, etc., *v.* LEWIS.

*(District Court, D. Cali,ornia.* November 11, 1880.)

1. FRAUD—CONSPIRACY—COLLUSIVE JUDGMENT—FICTITIOUS INDEBTEDNESS—FABRICATED ANTEDATED NOTES.

Where members of an insolvent firm, with intent to defraud firm creditors, conspired with a person to whom the firm was indebted in only a small amount to have an attachment levied on the firm property, and a judgment to be taken upon fictitious and ante-dated firm notes fabricated for the purpose, and to transfer to him all the firm property then *in transitu,* and for which the firm held bills of lading; and, in pursuance of such conspiracy, judgment was recovered, the firm property sold on execution, and bid in by the plaintiff in the collusive suit, and the remaining property of the firm secretly transferred to him, *held,* that he was liable to the assignees in bankruptcy, as representative of the firm creditors, for the value of all of the firm property so fraudulently obtained by him, and will be decreed a trustee of such property, and of its proceeds, for the benefit of the firm creditors represented by the assignee.

In Equity.

*James L. Crittenden,* for plaintiff.

*Henry E. Highton,* for respondent.

HOFFMAN, D. J. The complainant seeks by his bill in equity to have a certain judgment, execution, sheriff's sale, and other proceedings in a suit at law in the nineteenth district court of this state, entitled "*Harris Lewis* v. *Louis H. Shoenfeld, Isaac Newman, and Simon Cohen,*" declared to be a fraud upon the creditors of the firm of Schoenfeld, Cohen & Co., and upon the complainant, as their assignee in bankruptcy, upon Simon Cohen, and upon said firm; also, that it be declared and decreed that certain promissory notes upon which the suit was brought, to-wit, a note for $17,000, a note for $8,000, and a note for $5,000, were fraudulent and void as against said firm for want of consideration; also, that it be declared and decreed that certain transfers of money, bills of lading, promissory notes, and other property, to the respondent, by said Schoenfeld and Newman, were fraudulent and void as against the creditors of said firm, upon the complainant as their assignee, and upon Simon Cohen, one of the members thereof; also, that it be declared and decreed

v.6,no.8—48

that the respondent is a trustee for the benefit of the complainant of all the moneys, bills of lading, accounts, merchandise, chattels, and other property obtained by said Lewis through or by means of said action, attachment, judgment, execution, or sheriff's sale, or transferred or delivered to or received by him from said Schoenfeld, from said Newman, or from any other person, and also for such further and other relief, etc.; also, for an injunction and writ of *ne exeat*.

The facts and circumstances which constituted the fraud are particularly and fully set forth in the bill. Its allegations are sustained beyond all doubt or denial by the proofs. It is, perhaps, not easy to imagine a grosser case of conspiracy by merchants of fair repute to cheat and defraud their creditors, or one where the proofs could be more convincing and indisputable. The testimony is very voluminous. But the evidence to establish the fraud is that of seven witnesses only, viz., Lewis, Newman, Hyams, Schoenfeld, Naphtaly, Sharp, and Bremer, nearly all of whom were active participants in the fraud, either at its inception or during its progress or at its consummation.

I shall not attempt to give a detailed account of the various transactions by which the respondent, at the instance and by the aid of Newman and Schoenfeld, two of the three members of the firm, succeeded in getting possession of the entire assets of the partnership, to the exclusion of all its eastern and foreign creditors, and of nearly all its creditors in this state. It will be sufficient to state the nature and effect of the fraudulent conspiracy, and in a general way the means by which those objects were attained. The firm of Schoenfeld, Cohen & Co. was composed of three partners—Louis S. Schoenfeld, Isaac Newman, and Simon Cohen. Its capital was $30,000, contributed ($15,000 each) by Schoenfeld and Newman. Cohen was to contribute for a certain period his skill and experience in the business, and thereafter to furnish $15,000 to the capital, or pay interest on such portion thereof as he should fail to furnish. Each partner was to be at liberty to draw $250 per month for personal expenses. In January, 1877, it was determined between Schoenfeld and New-

man that the former should proceed to the eastern states and Europe to procure, if possible, a large stock of goods on credit. Aware that their credit would depend upon their financial standing here, and knowing that, if the true condition of their affairs was disclosed, Mr. Schoenfeld's expedition would prove abortive, they presented to one of the banks of this city a false statement of their profits and business affairs, sustained by false entries in their books as to their profits, and the amount of money loaned to the firm by Newman. Having thus firmly established their credit, Schoenfeld proceeded to the eastern states and to Europe, and succeeded in purchasing goods to the amount of more than $30,000, cost price. Whether, at the time the false credit was obtained, and Mr. Schoenfeld started for Europe to make his purchases, it was the intention of Newman and Schoenfeld to cheat the foreign creditors out of the whole price of any goods the firm might succeed in obtaining by false pretences as to their financial condition, or whether that project was formed after Mr. Schoenfeld's return, does not clearly appear. It is certain, however, that the preliminary steps for the perpetration of the fraud were taken immediately on his arrival. Mr. Schoenfeld returned to this city early in June, 1877. On the succeeding day he met Newman by appointment at their store, where the affairs of the firm were discussed. A subsequent meeting was soon after held, at which Mr. William Bremer, Mr. Hyams, and Mr. Lewis were also present.

For the full understanding of the agreement entered into at this meeting some explanation is necessary. The $15,000 contributed to the capital of the firm by Schoenfeld had been obtained by him by a loan of $8,000 from an old friend and former employer, Mr. H. Bremer, for which he had given his individual notes. He had paid in, in cash, $2,000. The remainder, $5,000, he had borrowed, on his individual note, from Newman, who claimed that the money belonged to a Mrs. Alexander, by whom it had been placed with him for investment. Newman had paid in cash the whole of the $15,000 to be contributed by him to the capital. He had also lent the firm on the firm's notes $18,000. These notes

were then held by the London & San Francisco Bank, having been hypothecated by Newman to secure a private loan of $6,000. The money had been originally obtained, as Newman asserted, and as appears to be the fact, from the respondent, and there is evidence tending to show that Newman had, without the knowledge of his partners, executed a note in the firm name to Lewis for $17,000 of the amount. On this point the testimony is conflicting. It is not material; for the note, if executed, was a fraud upon his other partners, and the respondent well knew that the firm note to Newman for the loan was outstanding. It had, in fact, been transferred by Newman to Lewis, and had been by the latter lent to Newman to enable him to deposit it as collateral security for his loan from the bank. At the first meeting nothing definite was effected. At the next meeting Mr. Newman explained the embarrassed condition of the firm. He stated that he owed $20,000, viz: the $18,000 already mentioned, and $2,000 which Lewis had loaned to the firm, and for which he held their genuine note; that Lewis was his only friend in the world, etc., and he insisted that he should be protected. Mr. Schoenfeld replied that if Lewis was to be protected, his confidential creditor should also be secured. This was assented to, and it was agreed that a firm note for $8,000 should be executed to Bremer, "so that the $8,000 should stand valid against the firm instead of against an individual member, in case any action should be taken." This was accordingly done on the succeeding day. The note was delivered to Mr. William Bremer, agent for H. Bremer, who was to hold it for presentation as a firm debt in case any suit was brought against the firm. Mr. Bremer did not then, nor at any time up to the trial of this cause, surrender the individual notes of Schoenfeld originally given by the latter to his brother.

A few days subsequently Mr. Schoenfeld received a peremptory notice from the Anglo-California Bank to make good the firm's indebtedness. This notice he communicated to Mr. Newman. A meeting was at once held to make arrangements for the consummation of the fraud which was in con-

templation. It was held in the private office of Lewis, and was attended by Schoenfeld, Newman, Lewis, and Mr. Naphtaly, as legal adviser. Its avowed object was to defraud the firm creditors by placing the entire assets of the firm in Lewis' hands, who was first to satisfy Newman's indebtedness to himself and the firm's indebtedness to him of $2,000. He was also to pay Schoenfeld's individual indebtedness of $8,000 to Bremer, and also the balance of his indebtedness of $4,000 to Newman or Mrs. Alexander. Whatever should remain after making these payments was to be divided between Newman and Schoenfeld. To enable Lewis to attach the property of the firm it was necessary that he should appear to be a firm creditor, and for this purpose a further fabrication of firm notes was required. At Mr. Naphtaly's suggestion, a demand note for $17,000, antedated as of December 23, 1876, was drawn up and signed by Mr. Schoenfeld in the firm name. Mr. Naphtaly, however, objected to the form of the note, as it appeared on its face to be long overdue. It was, therefore, destroyed, and a new firm note was made, antedated in like manner, but payable six months after date. A note was also made, by Mr. Naphtaly's advice, in favor of Mrs. Alexander for $4,000. This, too, was antedated. These notes were given to Mr. Naphtaly, with the understanding that an attachment suit should forthwith be commenced upon them—the fabricated firm note given to Bremer, and the genuine firm note for $2,000 held by Lewis. The note for $4,000 was returned on the same evening by Mr. Naphtaly, who, on reflection, preferred that the transaction should take. the form of an antedated firm guaranty of Schoenfeld's original note, rather than of a newly-fabricated note to Mrs. Alexander. The reason assigned for this preference was, according to Schoenfeld, that when there was a genuine note there was no need of resorting to a fabricated one. The difference either in morals or laws between fabricating the entire instrument and fabricating and antedating a firm guaranty of Schoenfeld's note to Newman, he did not, when examined as a witness, attempt to explain. All these preliminary preparations for carrying into effect the fraudu-

lent designs of the conspirators were made with the full knowledge of the respondent. He acted as their chosen and willing instrument. That the firm was insolvent he was well aware. Mr. Schoenfeld testifies that a few days before Lewis had suggested to him and Mr. Newman "to go ahead with the business if we thought we could run it, and he would give us the money to keep it up for a year or two longer, and we could get in a large credit and then bust up."

The fraudulent designs of the parties, and the complicity of Lewis, are confessed by Mr. Naphtaly himself. He testifies that Newman, Schoenfeld, and Lewis desired this attachment suit to be brought, *and to secure all the property of the firm of Schoenfeld, Cohen & Co., by means of that suit,* and they all acted in concert all the time until Lewis and Schoenfeld had the fight in the office. Naphtaly's Test. Trans. 878–9. Lewis *"knew that he was going to make more than his claim, and he didn't want anything for outsiders."* Naphtaly's Test. Trans. 881. By this felicitous epithet Mr. Naphtaly designates the whole body of foreign and eastern creditors, whose shipments, arrived and to arrive, it was proposed to appropriate without the payment of a single dollar of the purchase money. The arrangement being thus completed, the $8,000 firm note in Bremer's hands was obtained from him, and suit was brought in the name of Lewis for $41,000, and an attachment levied on the stock in trade, on debts and accounts of the firm. No scruple or hesitation seems to have been felt by any of the parties, or their attorney, in making the allegations under oath necessary to institute these proceedings.

The seizure by the sheriff of the stock in trade of the firm rendered it impracticable any longer to preserve the secrecy which, up to that time, had been carefully guarded. The banks and the agent for the foreign creditors became alarmed, and pressing in their demands that the suit should be defended. The chief danger which threatened the success of the plot was the institution of bankruptcy proceedings before a levy under judgment and execution could be made. It was therefore thought that some show or pretence of defending the

suit should be made.    The attorney selected by Mr. Naphtaly
for this purpose was Mr. W. H. Sharp.    It does not appear
that at this time Mr. Sharp was informed that the notes on
which the suit was brought had been fabricated, and that,
with the exception of the $2,000 note to Lewis, they repre-
sented no real indebtedness of the firm.    But he did know,
or rather he supposed, that a fraud on the bankruptcy act
was intended; that the suit was to be an "amicable" one;
that no defence was to be made and no obstacle interposed
to prevent the plaintiff from obtaining the preference over
all the creditors of the firm which the suit was instituted to
secure.

The foreign creditors of the firm were represented by Mr.
Shainwald.    He was very anxious that the suit should be
defended, and was distrustful of Schoenfeld's assurances that
a defence was intended.    This was communicated to Mr.
Sharp, who replied, "I know Shainwald; I will speak to him;
bring him to me."    Mr. Shainwald was soon after brought
to Mr. Sharp's office, and told by the latter that the suit
would be defended.    On this point Mr. Sharp's testimony is
as follows:    "*Question.* Then you said 'bring him to me?'
*Answer.* Yes, sir.    *Q.* Then you told Mr. Shainwald that the
suit would be defended?    *A.* That I was employed, and
would defend the suit.    *Q.* How could you make such a state-
ment if you were not so employed?    *A.* The day before that
it was understood that I should put in that demurrer—make
that defence.    *Q.* A frivolous demurrer for delay?    *A.* Yes,
sir; that is so.    I don't know that I used the word defend;
I may have said so.    *Q.* What made you tell him so if you
were not employed to make any defence, and it was with the
understanding, and to your knowledge, an amicable suit, and
you were not to obstruct the plaintiff in getting the judgment
at the earliest day, in order to defeat the bankrupt act?    *A.*
The object was to assure Mr. Shainwald that the approach-
ing default would not be allowed to be entered that he was
so much concerned about.    *Q. Was that a falsehood? A. I
was not under any obligation to him, I thought.*"    Sharp's Test.
Trans. 987.

With regard to this interview, Mr. Schoenfeld testifies that Mr. Sharp told Shainwald that "it would be quite a while before the suit would come up, and that he could fight it for a long time; and that Shainwald left the office satisfied that he would have ten days, and that he would have enough claims from the east within that time to put the firm into bankruptcy. It was understood privately, however, between Newman and Sharp and myself, that instead of the usual ten days allowed on overruling a demurrer, Sharp should take only three days. Naphtaly told me *he had fixed things with Sharp when he employed him. Mr. Naphtaly employed Sharp for defendants in the Lewis suit, and told me he had an understanding to take judgment in three days after the overruling of the demurrer.*" Schoenfeld's Test. Trans. 613–14. The judgment was taken accordingly.

Mr. Sharp's assurances do not seem to have allayed Mr. Shainwald's apprehensions. He still continued importunate in his demand on Mr. Schoenfeld that he should at once go into voluntary bankruptcy. He had discovered that there were only three days in which to answer. Unable to find any pretext for evading Shainwald's importunities, Schoenfeld applied for advice to Mr. Naphtaly. Schoenfeld testifies that he was told by Mr. Naphtaly to "tell him (Shainwald) that Mr. Sharp had neglected to put in the answer; that it was an oversight of his which he discovered, and came to me not to take advantage of it. For God's sake do not let him get any papers in the United States district court before 10 o'clock in the morning." Trans. 617.

Similar representations with regard to the intended defence of the suit were made to Mr. Belknap, an attorney employed by the banks. Mr. Naphtaly himself admits that he *really intended to deceive Mr. Belknap in regard to the matter, and make him believe that Mr. Sharp was employed to defend the suit.* Trans. 913. The bank, however, was assured that it should receive a *pro rata* share of whatever sum the goods might bring at the sale on execution.

I have entered somewhat minutely into these repulsive details of falsehood and deception, because they were neces-

sary to show beyond dispute or cavil the fraudulent and collusive character of the suit and the sham defence that was made to it. It is, perhaps, hardly necessary to add that Mr. Sharp, the attorney for defendants, sent his bill to and was paid by Lewis, the plaintiff. The arrangement made with the banks for a *pro rata* share of the proceeds of the sale on execution made it for the interests of the conspirators that Lewis should bid them in for the lowest possible price. No effort was spared to accomplish this object. Only the indispensable advertisements were published, and but little opportunity was afforded to the public to ascertain the value and quality of the goods. But a private inventory, with the cost prices attached, was made out and given exclusively to Mr. Lewis. Efforts were made to discourage other parties from bidding, and the contents of the store were sold by the floor, and not in lots, as would have been most advantageous. Mr. Lewis succeeded in becoming the purchaser for a sum insignificant in comparison with the market value of the goods.

It is unnecessary to recount in detail the remaining steps taken to consummate the fraudulent designs of the parties. Enough to say that by various methods Lewis succeeded in obtaining possession of almost the entire assets of the firm, including the bills of lading for the goods purchased abroad by Schoenfeld. Nothing has ever been paid to any of these creditors. Several months having elapsed, Mr. Schoenfeld became impatient for the payment to Mr. Bremer of the $8,000 promised as his share of the plunder. To this Lewis demurred. A quarrel ensued, and Schoenfeld disclosed the whole affair to Mr. Cohen, who seems to have been up to that time ignorant of its real nature. Legal advice was at once taken, and Mr. Crittenden, solicitor for complainant in the present suit, on behalf of Cohen requested of Mr. Sharp to consent to his substitution as attorney for Cohen, or that Sharp should unite with him in a motion to set aside the judgment. Mr. Sharp declined both propositions, although he was advised by Mr. Crittenden of the nature and origin of the fabricated notes upon which judgment had been recov-

ered, and was informed that Cohen had never been served with process in the suit, and had been kept in ignorance of the proceedings. Mr. Crittenden thereupon determined to move in the nineteenth court that he be substituted as attorney for Cohen, and that the judgment be set aside. The motion was accordingly made on affidavits alleging in substance what has been proved in this cause, and narrated in this opinion. The motion was opposed by Mr. Naphtaly, assisted by Mr. Sharp, who furnished him with an affidavit, and gave him "all the co-operation in his power that the judgment should stand." Mr. Sharp states that his reason, or one of his reasons, for this, was that the rights of other persons were concerned. When asked to whom he referred, he replied that he referred to Mr. Lewis.

The motion to set aside the judgment was denied by the court. The motion to substitute has never been decided. On the twenty-sixth day of April, 1878, a voluntary petition in bankruptcy was filed by Cohen and Schoenfeld, under which the firm was adjudicated bankrupt. Mr. Shainwald was subsequently appointed assignee, and the present suit was commenced.

No comment is necessary upon the facts related in the foregoing narrative. They exhibit as flagrant a case of gross and deliberate fraud upon creditors as can be well imagined. The fraud derives an additional heinousness from the fact that a court of justice was made the instrument of its perpetration by its own officers, whose highest professional duty was to demean themselves uprightly before it, and to scrupulously abstain from all attempts to deceive or impose upon it. The court was not only induced by falsehood and deceit to render judgment for the plaintiff in a collusive suit, brought on fictitious demands, but it was prevented from correcting its error by the strenuous opposition of both the attorneys, supported by their own affidavits. If practices like these are suffered to pass without exposure and rebuke, the legal profession will rapidly decline in public esteem, the authority of the courts will be weakened, and even respect for the law itself, without which free institutions are impossible, will be

gradually, but surely, destroyed. The frauds perpetrated in this case are, therefore, more than a private wrong. They rise to the bad eminence of a public crime.

In fixing the amount of the decree I have sought to ascertain the value of the firm's assets which came into the possession of the respondent. The nature of the inquiry forbade the hope of any very accurate result. I have indicated in a memorandum filed with the decree the various items of which the aggregate sum decreed is composed. To enumerate them here and to give in detail the testimony in regard to them, would greatly increase the length of this opinion, already longer than I could have wished. It will, perhaps, not be thought unreasonably long when it is considered that the testimony in the case covers more than 2,200 written pages. Besides, *non sunt longa ubi nihil est quod demere possis.*

The following decree was entered November 5, 1880:

This cause came on to be heard at this term, and was argued by counsel; and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, viz.:

*First.* That the judgment of the district court of the nineteenth judicial district of the state of California, in and for the city and county of San Francisco, in the action in said court entitled "*H. Lewis, plaintiff,* v. *Louis S. Schoenfeld, Simon Cohen, and Isaac Newman, defendants,*" which was rendered, entered, and recorded on or about the seventeenth day of July, A. D. 1877, being the judgment mentioned and described in the plaintiff's bill in this cause, was procured and obtained by the said Harris Lewis, respondent herein, by fraud and collusion, and was and is a fraud upon and against said Simon Cohen, also upon and against the said firm of Schoenfeld, Cohen & Co., also upon and against the creditors of said firm of Schoenfeld, Cohen & Co., and also upon and against the complainant, the said Herman Schainwald, as assignee in bankruptcy of the firm of Schoenfeld, Cohen & Co., and of Louis S. Schoenfeld, Isaac Newman, and Simon Cohen, bankrupts.

*Second.* That said judgment of said nineteenth district court of the state of California, and also the entry and record of said judgment, be and the same and each of the same is and are hereby declared, adjudged, and decreed null and void, and of no effect.

*Third.* That said action in said district court of the nineteenth judicial district of the state of California, the writs of attachment and the writ of execution issued therein, each and every levy and all levies made on or under or by virtue of said writs, or of either of them, the sale under said writ of execution by the sheriff of the city and county of San Francisco, the purchase and purchases made at said sheriff's sale by said Harris

Lewis, respondent herein, the order made and rendered by said district court of the ninteenth judicial district of the state of California denying the application of said Simon Cohen and said Louis S. Schoenfeld for an order vacating and setting aside said judgment, and each, all, and every of the proceedings in said action, was and were commenced, had, done, taken, obtained, and procured by and through fraud and collusion on the part of the said Harris Lewis and of his agents and attorneys, and with the intent, object, purpose, and design of cheating and defrauding the creditors of said firm of Schoenfeld, Cohen & Co., and in pursuance of a secret, illegal, and fraudulent combination, conspiracy, and agreeement between said Harris Lewis, Louis S. Schoenfeld, and Isaac Newman to defraud the creditors of said firm; and said action and the aforesaid writs, levies, sales, purchases, and orders, and each, all, and every proceeding and proceedings in said action, is and are hereby declared, adjudged, and decreed to be a fraud upon and against said Simon Cohen, also upon and against the said firm of Schoenfeld, Cohen & Co., also upon and against the creditors of said firm of Schoenfeld, Cohen & Co., and also upon and against the said Herman Shainwald, as assignee in bankruptcy of the firm of Schoenfeld, Cohen & Co., and of Louis S. Schoenfeld, Isaac Newman, and Simon Cohen, bankrupts, and is and are hereby declared, adjudged, and decreed null and void, and of no effect.

*Fourth.* That the said district court of the nineteenth judicial district of the state of California did not acquire any jurisdiction in said action over said Simon Cohen, and the judgment and writ of execution therein, and all proceedings thereon, were and are, and each and every one of them is, null and void for want of jurisdiction in or on the part of said court over the person of said Simon Cohen.

*Fifth.* That the $17,000, $8,000, and $5,000 promissory notes mentioned and described in the complainant's bill herein, and upon which said Harris Lewis obtained said judgment in said district court of the nineteenth judicial district of the state of California, were, and each of them was, manufactured and delivered by said Louis S. Schoenfeld and Isaac Newman to said Harris Lewis, and was and were procured and received by and through fraud by and on the part of said Harris Lewis, without any consideration being paid therefor to said firm of Schoenfeld, Cohen & Co., and with the intent, object, and design to cheat and defraud the creditors of said firm, and in execution of the aforesaid combination, conspiracy, and agreement; and the said notes are, and each of them is, hereby declared, adjudged, and decreed to be null and void, and the said Harris Lewis is hereby ordered to deliver and surrender each, all, and every one of said promissory notes to said Herman Shainwald, as assignee as aforesaid, within five days.

*Sixth.* That all the money and property of the firm of Schoenfeld, Cohen & Co. which was received or obtained possession of by the respondent, Harris Lewis, on or subsequent to the twenty-third day of June, A. D. 1877, by or through any purchase at sheriff's sale or from William H. Bremer, Isaac Newman, Louis S. Schoenfeld, or from any other person, was and were obtained possession of, delivered to, and received by him by and through fraud, and by and through an illegal and fraudulent

combination and conspiracy between said Harris Lewis and the said Isaac Newman, Louis S. Schoenfeld, and other persons, to cheat and defraud the creditors of said firm of Schoenfeld, Cohen & Co.; and the said respondent, Harry Lewis, is hereby declared, adjudged, and decreed to be a trustee for the benefit of the creditors of said firm of Schoenfeld, Cohen & Co., and for the benefit of said Herman Shainwald, as assignee in bankruptcy of said firm, and of the individual members of said firm as aforesaid, of all the money and property of said firm as received, delivered to, or obtained possession of by him, the said Harris Lewis, and also of any and all interest, profit, profits, income, and proceeds made, secured, obtained, or in any way or manner or form realized by him, the said Harris Lewis, by or from, or by means of the use of, said money and property, or any part thereof, or by the use of any such interests, profits, or proceeds; and the said Harris Lewis is hereby declared, adjudged, and decreed to be a trustee of the sum of $81,425.07, in lawful money of the United States, for the benefit of said Herman Shainwald, as assignee in bankruptcy of the firm of Schoenfeld, Cohen & Co., and of Louis S. Schoenfeld, Isaac Newman, and Simon Cohen, bankrupts, the same being the aggregate amount of the said moneys and property of said firm received and obtained by said respondent as aforesaid by fraud and collusion before the first day of November, A. D. 1877.

*Seventh.* That the complainant, Herman Shainwald, recover from the respondent, Harris Lewis, and that the respondent, Harris Lewis, forthwith pay to the said Herman Shainwald, the complainant herein, the sum of $81,425.07, and the further sum of $17,091.26, interest on the aforesaid sum of $81,425.07 from the first day of November, A. D. 1877.

*Eighth.* That the injunction heretofore issued in this suit on the eighteenth day of November, A. D. 1879, be and the same is hereby made and declared to be perpetual.

*Ninth.* That the complainant, Herman Shainwald, as assignee as aforesaid, recover from the respondent, Harris Lewis, and that the respondent pay to the complainant, all the costs and disbursements by said complainant incurred or paid out in this cause, the same to be taxed by the clerk of this court.

*Tenth.* That the writ of injunction issued forthwith out of this court commanding the said Harris Lewis, his agents, attorneys, servants, and assigns, to cease, desist, and refrain forever from claiming or asserting any right to said judgment, or to any writ or levy of execution, or to any order, relief, or other proceeding, in the said action in the said district court of the nineteenth judicial district of the state of California, and from prosecuting said action or taking any other or further proceeding therein, and from issuing or procuring to be issued therein any writ or other process, mesne or final, and from doing any other act or thing therein, and from assigning, transferring, or otherwise disposing of said judgment, or any part or portion thereof, and also from asserting or setting up in any way, manner, or form any claim, right, title, interest, or ownership of, in, or to the promissory notes for $17,000, $8,000, and $5,000 hereinabove mentioned, or of, in, or to any or either of them.